# Keilich, Appellant, *v.* Blum.

*Contract—Oral contract—Written contract—Commissions on sale of property—Partnership.*

On a bill in equity for an accounting, it appeared that plaintiffs and defendant had entered into an oral agreement to divide profits realized from any sale of a certain property, and that subsequently they entered into a written agreement as to division of profits on one particular sale that was contemplated. The court below, affirmed by the Supreme Court, held from a construction of the oral and written agreements, and from the acts of the parties, that the written agreement superseded the oral agreement so that the plaintiffs were not entitled to share in the profits realized by defendant on a sale other than that specified in the written agreement.

Argued Jan. 3, 1906. Appeal, No. 5, Jan. T., 1905, by plaintiff from decree of C. P. No. 5, Phila. Co., Sept. T., 1901, No. 3781, dismissing bill in equity in case of Louis A. Keilich and Charles D. Cramp v. Gabriel Blum and Jennie Blum. Before MITCHELL, C. J., BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Bill in equity for an account. Before RALSTON, J.
The trial judge filed the following opinion :

## FINDINGS OF FACT.

It appears from the testimony of Frederick J. Geiger, a member of this bar, that some time in the fall of 1899, Keilich, one of the plaintiffs, called upon him and stated that the board of directors of a certain company were about to erect a cement plant. He then suggested to Keilich that his company should purchase the Coplay Cement Company. Geiger obtained an option from all the stockholders of the company, which expired November 26 or 27, 1899. He gave to Keilich an option which expired on October 28, 1899, at which time all of his rights ceased.

After Keilich's option had expired, Geiger told him that he did not desire to have any more negotiations with him, but that if he would bring him responsible parties, who could pay a forfeit of $30,000, he would enter into negotiations with them.

Some time between January 10 and 15, 1900, Keilich called upon Blum, and told him that he had control of the Coplay Cement Company, through Geiger's efforts ; that Geiger had furnished him with an option and would furnish an option to the party he would bring, and that Geiger had it open for him at all times. Keilich testified that the option which Geiger had given to him continued until January, and that Geiger's option had not expired when he first saw Blum, but "was active all the time when I saw Mr. Blum," and did not expire until some time afterward. In this, he is evidently mistaken. Keilich and Cramp both testified that at this interview with Blum, it was agreed that they should divide the profits derived from any sale or reorganization of the company into three parts—one for each of them. At this first interview Keilich handed to Blum certain reports and other documents relating to the condition of the company, and Blum said he would read them over.

In the latter part of January or early in February, Keilich introduced Blum to Geiger. Blum then discovered that neither Keilich nor Geiger had an option, but that Geiger had a certain influence with the owners of the property by reason of having represented for a number of years the owner of a large interest in the stock.

Some time in the early part of February, Edgar Cohen, representing a syndicate of English capitalists, arrived from London, and Blum opened to him the subject of the purchase of the Coplay Cement Company.

On March 3, 1900, Blum, Keilich and Cramp, entered into a written agreement, as follows :

"Whereas, we, the undersigned, are engaged in negotiating a sale of the plant, stock, business and assets generally of the Coplay Cement Company to a syndicate who propose to purchase the same and form a new company for carrying on the business, and in carrying such negotiations to a successful issue our and each of our services are necessary.

"1. We therefore agree to give our and each of our utmost aid and assistance in the above matter, and to act together and for our joint interest.

"2. We agree that the compensation received for our services in negotiating said sale (which is to be forty thousand dollars in

cash, payable when purchasing syndicate make final settlement with the vendor) shall be equally divided between us.

" Witness our hands and seals this third day of March, A. D. 1900.

| " Witnesses, | " CHAS. D. CRAMP, | [L. S.] |
|---|---|---|
| " F. EARL VON LEER | " LOUIS A. KEILICH, | [L. S.] |
| | " GABRIEL BLUM, | [L. S.] " |

On March 10, 1900, an agreement was entered into between Cohen and Blum, which is as follows :

" Whereas, Edgar Cohen, has for some time past been negotiating for the purchase of the plant, business and assets of the Coplay Cement Company, located at Coplay, Pennsylvania.

" And whereas, the said negotiations were initiated by and have been carried on through Charles D. Cramp, Louis A. Keilich, and Gabriel Blum, and said Cohen, desires to secure the services of said gentlemen in bringing said negotiations to a successful termination in the consummation of said purchase.

" Now therefore, in consideration of the premises and of other good and valuable consideration, it is hereby stipulated and agreed as follows, viz. :

" 1. The said Charles D. Cramp, Louis Keilich and Gabriel Blum, are to continue to give their aid and assistance in bringing about a consummation of said purchase.

" 2. The said Edgar Cohen agrees and binds himself on consummation of said purchase to pay to the said Charles D. Cramp, Louis Keilich, and Gabriel Blum, as compensation for their said services in aid of said purchase, the sum of $40,000 to be equally divided between them.

" 3. That said payment shall be made by said Edgar Cohen to the gentlemen aforesaid at the time of the final settlement with the vendors at the consummation of said purchase.

" In witness whereof, the parties have hereunto set their hands and seals this tenth day of March, A. D. 1900.

| " Witnesses, | " EDGAR COHEN, | [L. S.] |
|---|---|---|
| | " GABRIEL BLUM, | [L. S.] " |

The amount of compensation to be received from the Eng-

lish syndicate was modified on October 31, 1900, by the following letter:—

"PHILADELPHIA, October 31, 1900.

"Mr. G. Blum.

"Dear Sir:—We hereby authorize you to subscribe for each of us to $5,000 of the preferred shares of the new company, same to be paid out of the commissions which we are to receive, as per agreement with Mr. Edgar Cohen, and the balance due us is to be paid us in cash—or should the purchasers insist on our accepting less than the sum of $25,000 originally agreed upon on the ground that we had agreed some time in July to accept the sum of $10,000 provided same was paid us on or about August 1, you are then authorized, if you find it necessary to do so, to accept in lieu of the $25,000 the sum of $15,000, same to be paid to us in preferred shares of the company at par, or if you can succeed in getting the total sum of $25,000 by our subscribing to $25,000 preferred stock, you may do so, or if, under no circumstances will they agree not to pay over $10,000 in cash, you are then authorized to accept that sum in full settlement, or that they pay us $10,000 in cash and $10,000 preferred shares, or whatever arrangement you may enter into will be entirely satisfactory to us, and whatever expenses you may have on your European trip shall be refunded to you by deducting same from our commissions.

"CHAS. D. CRAMP,
"LOUIS A. KEILICH."

By the efforts of the parties and upon the payment of $20,000 the English syndicate procured an agreement of sale or option, to expire July 11, 1900, which was, subsequently, upon the payment of $30,000, extended to December 31, 1900.

In December, 1900, Blum learned by cablegram from England that the syndicate would probably not be able to complete the purchase. Accordingly, on December 19, 1900, he procured from Cramp and Keilich the following release :

"Whereas, The English Syndicate, represented by Edgar Cohen, of London, will not complete its purchase of the Coplay Cement Company and have notified you by cable that they will relinquish their option.

"Now therefore, for value received, we agree to and do

hereby release Gabriel Blum from all claims under contracts now existing with Edgar Cohen (and it is further agreed that all relations existing between us relative to said Coplay Cement Company are hereby annulled).

"Witness our hands and seals this nineteenth day of December, 1900.

During November and December, 1900, Blum had talked with certain parties in New York about the Coplay Cement Company, and early in January, 1900, shortly after the option of the English syndicate had expired, he entered into negotiations with Sutro Brothers & Co., which eventually led to the purchase and reorganization of the company by himself and Sutro Brothers & Co.

The agreement of March 3, 1900, made after Blum learned that Keilich had no option and no influence with Geiger, relating, as it does, to the same subject as the alleged previous verbal agreement, must be taken to represent the final understanding of the parties and to define and fix their rights in their relations with each other. It constitutes a partnership between them for the purpose of selling the Coplay Cement Company to the English syndicate, represented by Edgar Cohen, and when their association under that agreement ceased their responsibility to each other came to an end.

There is no complaint by the plaintiffs of any action of Blum's during the existence of this agreement. After the English syndicate's option had expired, Blum was at liberty to act in relation to the company without regard to Keilich and Cramp.

The bill is dismissed with costs.

*Error assigned* was decree dismissing the bill.

*E. Cooper Shapley*, with him *Edwin C. Nevin*, for appellants.

*Thomas Earle White*, with him *White, White & Taulane*, for appellees.

OPINION BY MR. JUSTICE MESTREZAT, February 19, 1906:
This was a bill filed by the appellants for an accounting in a business transaction which they claim to be a partnership between themselves and the defendant, Gabriel Blum. The ap-

pellants allege that they had an interview with Blum, one of the appellees, in January, 1900, in which it was agreed that the three parties should sell, for the owners, the Coplay Cement Company plant and divide the profits or commissions realized therefrom among them equally; that in pursuance of said agreement the property was finally sold by Blum, and that they are each entitled to the one-third of the profits or commissions which he received for selling the plant. Blum denies the right to an accounting, and denies that he sold the plant or received any profits or commissions for selling it. He alleges that in March, 1900, the three parties entered into a written agreement by which they were to act together and for their joint interests in selling the Coplay Cement Company plant to an English syndicate, and that this agreement superseded and took the place of any prior oral agreement which was entered into between the parties relative to the sale of the plant. It is further alleged by Blum that all subsequent agreements between him and the appellants, bearing on the sale of the plant, were in writing, and that their relations pertaining to the sale of the plant were terminated by a written release executed by the appellants and delivered to Blum on December 19, 1900.

The learned trial judge held that the agreement of March 3, 1900, related to the same subject as the alleged previous verbal agreement, and should be taken to represent the final understanding of the parties and to define and fix their rights in their relations with each other. The appellants concede that if the trial judge was right in this conclusion, that the agreement of March 3, 1900, embodied the whole contract between the parties, that their entire case falls to the ground.

We agree with the court below in his conclusion that the written contract of March 3, 1900, took the place of any alleged prior oral agreement between the parties, and that what was done by them in attempting to sell the cement company plant was done in pursuance of that agreement. It conclusively appears that at the date of the interview between Keilich and Blum in January, 1900, that Keilich misrepresented to Blum that he had at that time the control of an option on the plant. The trial judge so finds, and his finding is amply supported by the testimony in the case. The consideration for

Blum entering into an arrangement or agreement to divide
profits with Keilich and Cramp was the fact that Keilich con-
trolled an option on the plant, otherwise there was no reason
for Blum giving his time and services in trying to sell the plant
and dividing the profits or commissions on the sale with the
appellants.   Blum did not discover that Keilich had no option
or control of an option on the plant at the time of their inter-
view in January, 1900, until he subsequently saw Mr. Geiger,
in the latter part of January or early in February, when Geiger
disclosed the fact to Blum that Keilich's option had expired on
October 28, 1899, and that all of Keilich's rights to sell the
plant had ceased after that date.   After Blum had had this in-
terview with Geiger, and had ascertained Keilich's inability
through the want of an option to transfer the cement plant to
a purchaser, Blum determined that thereafter any arrangement
or agreement between the appellants and himself by which they
were to act jointly in making a sale of the plant should be in
writing.   Before any further steps were taken towards nego-
tiating a sale of the plant the three parties entered into the
written contract of March 3, 1900, which the appellants allege
did not supersede or take the place of the alleged prior oral
agreement by which the three parties were to divide the profits
or commissions on any sale of the cement plant, and under
which they bring this bill for an accounting.   On the other
hand, Blum claims that it did supersede any prior agreement
between the parties, and that when it was terminated the rela-
tions between the parties in trying to make sale of the plant
ceased and determined.

We think it manifest from the written agreement itself that
the parties intended to make it the final and only contract be-
tween them relative to negotiating a sale of the cement com-
pany plant.   If the alleged oral agreement was, as claimed by
appellants, to continue in force, it was general, and applied to
any sale that might be made by the parties, and hence it in-
cluded the provisions of the written contract and any sale that
might be made in pursuance thereof to the English syndicate.
It applied to any sale, while the written contract was applica-
ble only to a sale to the English syndicate.   If, therefore, the
appellants' contention be correct, there was no necessity what-
ever for the written agreement.   It will be observed that the

alleged oral agreement provided that the profits derived from any sale of the cement plant should be divided into three parts, while the written agreement provided " that the compensation received for our services in negotiating said sale shall be equally divided between us." The written agreement, it is true, in addition to fixing each party's share of the profits, also provided that the parties should give their aid and assistance and act together and for their joint interests in making the sale to the syndicate. This, however, they were compelled to do under the alleged parol agreement. The two stipulations embrace the whole of the written contract, save the reference to the syndicate as the proposed purchaser, and hence it will be observed that that contract was wholly unnecessary if the prior alleged oral agreement was still in existence. The written contract, therefore, if the appellants' contention be correct, was a vain thing. It in no manner changed the terms of the alleged prior oral agreement, and gave no new rights to the appellants, and imposed no other or greater responsibilities upon the appellee. In addition to this manifest intention of the parties to make the written contract the only agreement between them defining their rights and duties in making sale of the cement plant, the recital in the written contract clearly discloses that it was to be the only agreement between the parties. The contract shows in its recital that the parties are jointly interested in making a sale of the cement company plant to a particular purchaser. It recites " that they are engaged in negotiating a sale of the plant, stock, business and assets generally of the Coplay Cement Company to a syndicate who propose to purchase the same." If the contention of the appellants be true, the parties at that time were, by virtue of a parol contract, jointly engaged in attempting to make a sale to this particular syndicate, and also engaged in trying to sell to anyone who would purchase the plant. If they were engaged in trying to negotiate a sale of the plant to any purchaser who desired to buy, why did they enter into this written contract to act together in trying to make this particular sale ? Why did they not recite in the written contract that they were trying to make a sale of the plant, without stating that their joint labors were enlisted in making a sale to this syndicate ? The language thus used clearly indicates that

their joint efforts relating to a sale of the cement plant were limited to a sale to the syndicate, and hence that any prior oral agreement of a general nature relative thereto was abandoned and was no longer operative. The reference in the written agreement to the amount of compensation which they were to receive for making the sale was not a stipulation fixing that amount, but a parenthetical statement of a sum which previously had been agreed to among them.

Pursuant to the written contract of March 3, 1900, Blum, for himself, Keilich and Cramp, entered into a written agreement on March 10, 1900, with Edgar Cohen, representing an English syndicate, by which the services of Blum and his associates were secured in bringing to a successful termination the negotiations for a sale of the cement company plant to Cohen. The consideration to be paid by Cohen for the services rendered was the sum of $40,000. On October 31, 1900, while Blum and his associates were still assisting Cohen in his negotiations for the purchase of the Cement plant, Cramp and Keilich authorized Blum to accept for their services less than $40,000 ; in fact, any sum which he could secure. If the alleged oral agreement was still subsisting, there was no reason why Cramp and Keilich should have been willing to reduce their commissions to the amount which they authorized Blum to accept. If the sale was not made to the English syndicate they still had an opportunity, if their contention be correct, of making a sale to others, and of still receiving, in conjunction with Blum, what they deemed a fair compensation for their services. If, on the other hand, the relations of the parties in making the sale were to end with the failure to sell to the English syndicate, the reason for their anxiety to consummate the sale to Cohen is manifest.

Nor do we agree with the contention of the appellants that the release of December 19, 1900, supports their contention that the alleged oral agreement continued in operation during the existence of the written agreement and subsequent thereto until the property was finally disposed of. When it was ascertained in December, 1900, that the English syndicate would not purchase the property, Cramp and Keilich, under their hands and seals, released Blum " from all claims under contracts now existing with Edgar Cohen." In preparing this

written release there had been added to the words just quoted, " and it is further agreed that all relations existing between us relative to said Coplay Cement Company are hereby annulled." These words were stricken out before the release was signed. The testimony discloses no reason for striking them out. If, however, there was still an existing oral agreement by which the parties were to make sale of the property and divide the profits, is it not apparent that Blum would have had those words remain in the release ? The record discloses no reason why Blum should have desired to sever his relations with the appellants in negotiating a sale to a particular purchaser and at the same time desired to continue such relations with them, on the same terms, in trying to make a sale to any other purchaser who might wish to buy the plant. If it was important for him to have a release in writing, relieving him from liability on the Cohen contract, why was it not equally important that he should have a written contract releasing him from responsibility for his action under any existing oral contract ? It is apparent, we think, that the reason for omitting from the release the words stricken from it was that all parties regarded the written contract relative to the sale of the plant to the English syndicate as the only existing agreement between them on the subject.

The view we take of the case requires no consideration of the other points raised in the appellants' argument.

The decree of the court below is affirmed.